UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| INDUSTRIAL CONTROL | ) | Chapter 7 |
| SOLUTIONS, INC., | ) | Case No. 08-41701-JBR |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| JOSEPH A. BALDIGA, | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 09-04014 |
| v. | ) | |
| | ) | |
| UNIVERSAL FUNDING CORP. | ) | |
| and | ) | |
| NATIONAL GRID USA, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding was initiated by the Chapter 7 Trustee, Joseph H. Baldiga, seeking turnover of estate property pursuant to Sections 541 and 542 of the Bankruptcy Code. The action originally named both Universal Funding Corporation ("Universal") and National Grid USA ("National Grid") as defendants, but default judgment [docket # 21] entered early in the case against National Grid, leaving only Universal. Universal admits liability, i.e. that it owes money to the bankruptcy estate. The remaining issue, which comes before the Court on the Trustee's motion for summary judgment [docket # 24] is the amount of damages that Universal owes.

**Undisputed Facts**

On May 28, 2008, the debtor, Industrial Control Solutions, Inc. ("ICS"), filed a petition

-1-

for relief under Chapter 11 of the Bankruptcy Code. At that time, ICS and the defendant, Universal, were the parties to a collection of agreements, hereinafter the "Factoring Agreements" whereby Universal purchased accounts payable from ICS.[1] Soon after the petition was filed, the Trustee filed a motion to reaffirm and modify the Factoring Agreements, hereinafter the "Factoring Motion" [docket #36 in the main case].[2] On June 26, 2008, after notice and a hearing, the Court issued an order granting that motion, hereinafter the "Factoring Order," which imposed–among other conditions on the revived Factoring Agreements–the conditions set forth in the Factoring Motion. *See* Final Order at paragraph 6 [docket # 83 in the main case].

Under the terms of the Factoring Agreements, Universal was given the option to purchase from ICS various accounts payable. As Universal collected the accounts, it would determine the purchase price by subtracting from the collected amount various agreed-upon fees. Universal was authorized to maintain a reserve account of 20 percent of its gross collections. The Factoring Agreements further provided that Universal could, at its discretion, advance to ICS up to 80% of the gross face value of each account purchased, and apply any collected funds against these advances.

The Factoring Order, incorporating the Factoring Motion, added terms to the Factoring Agreements to facilitate their operation while ICS was in bankruptcy. The Factoring Order granted Universal a priority administrative claim on all of ICS's assets to the extent of any

---

[1] These included the contracts styled "Purchase and Assignment Agreement," "Security Agreement," and "Purchase Order Finance Agreement." *See* Ex. A to Trustee's Motion for Authority to Enter into Secured Post-Petition Financing Agreement, docket # 36 in the main case, *In re: Industrial Control Solutions, Inc.*, 08-41701-JBR.

[2] Joseph H. Baldiga was appointed as the Chapter 11 Trustee, and later appointed as the Chapter 7 Trustee once the case converted. All references to the "Trustee" pertain to him.

obligations owed to Universal by ICS under the Factoring Agreements. However, this administrative claim was subordinated in priority to all other administrative expenses. In addition, any advances made by Universal to ICS were immediately recoverable upon payment of their corresponding accounts.

On October 10, 2008, ICS's case was converted to Chapter 7. Accordingly, the Trustee began to marshal the property of the estate for distribution to creditors, and came to the conclusion that Universal was withholding funds it owed to ICS under the Factoring Agreements. After the case's denouement, the parties agreed that $37,014.44, representing the balance in the reserve account as of October 10, 2009 (the date the case was converted to Chapter 7), was owed by Universal to ICS. Two questions of fact remain concerning the amount owed to ICS. The first question is whether Universal is entitled to retain the fees it earned on the funds it advanced to ICS, and if not, how much it must return to the Trustee. The second question is whether Universal must turnover a check it received from National Grid in December of 2008.

**Advance Fees Retained by Universal**

Under the Factoring Order, Universal was entitled to collect separate fees on both the accounts that it factored and the funds that it advanced to ICS. It is undisputed that the fees earned on the factored accounts gave rise to a junior administrative claim. Where the parties disagree is the treatment of fees *earned on advances to ICS*. The Trustee contends that these fees ought to be treated as identical to the fees earned on the factored accounts; Universal contends that these fees are entitled to the same status as the advanced funds themselves. If the advance fees are treated like those earned on the factored accounts, they must be turned over to the Trustee, and will be subject to all other administrative claims.

In support of his position, the Trustee cites an absence of specific language dealing with the treatment of fees earned on advances, and argues that consequently these fees must be treated like all other fees provided for by the Factoring Agreements. Universal responds that "it would be a colossally bad deal if a factor was [sic] . . . able only to collect the advance from the debtor but not the interest or factoring fees . . .," and asks the Court to read the contract with this point in mind. Transcript at 19 [docket # 43]. The Court finds the Trustee's argument to be the more persuasive of the two for the following reasons.

Paragraph 16 of the Financing Motion provides:

The monies advanced pursuant to the Factoring [Agreements] shall be payable in full upon the earlier of (i) payment of the account receivable pursuant to the factoring and/or purchase order funding of that receivable; (ii) any sale of substantially all of the Debtor's assets; (iii) the date on which the Court enters an order confirming a plan of reorganization (including a liquidating plan) for the Debtor; or (iv) December 31, 2008.

[docket # 36 in the main case]. This language is unambiguous. The Court recognizes that in some cases, it is necessary to read into the language of a contract a party's unexpressed yet obvious desire to obtain a commercially advantageous result. *See National Tax Institute v. Topnotch at Stowe Resort and Spa*, 388 F.3d 15, 19 (1st Cir. 2004) ("Agreements, especially commercial arrangements, are designed to make sense. If one reading produces a plausible result for which the parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives)."). But that is hardly the case here. The plain language

-4-

of the parties, especially when considered alongside the rest of the agreement, does not inure so strongly to the benefit of one party as to render its literal meaning unenforceable. In such circumstances, the Court will not read "monies advanced" to read, "monies advanced and fees earned therefrom." Thus the fees are recoverable by the Trustee.

Also in dispute is the amount of fees that Universal retained and currently holds. Pursuant to the Factoring Agreements, Universal retained a certain portion of its gross collections in a reserve account. By the explicit terms of the Factoring Motion, reserve-account funds are subject to administrative claims, and are thus recoverable by the Trustee. *See* Factoring Motion at para. 16 [docket # 36 in the main case]. Universal admits that over the period between the petition date and the conversion date, it withdrew from the reserve account the advance fees to which it believed itself immediately entitled under the Factoring Order. As discussed *supra*, Universal was not immediately entitled to those fees and therefore Universal must turn over any such funds that it withdrew from the reserve account.

Agreed Exhibit 3 is a balance sheet titled "Universal Funding Corporation Reserve Account Report," which tracks the balance of the reserve account from May of 2008 until after the conversion date of October 10, 2008. Similar to the rest of the internal records furnished by Universal, the Reserve Account Report is maddeningly and unnecessarily convoluted, frequently listing transactions that were recorded and then reversed in the same day for no apparent reason. It is thus understandable that the parties posit different interpretations of the document. The Trustee asserts that a total of $42,697.30 in fees was withdrawn by Universal in 21 different, non-uniform transactions during the relevant time period, while Universal argues that eight transactions, accounting for $10,769.68 of that figure, should not be considered withdrawals

because they were each immediately reversed (i.e. an amount identical to the withdrawal was deposited into the account on the same day).

After wading through the Reserve Account Report, the Court concludes that there is some merit to Universal's transaction-reversal defense. In seven of the 21 transactions cited by the Trustee, an entry listed as a "fee" and corresponding to a subtraction from the account balance is followed by an entry listed as a "reserve change," depositing an identical amount back into the account. Although it seems only fair that Universal should bear the consequences of its obfuscatory recordkeeping, it is plain enough that these seven transactions, totaling $6,385.56, were in fact reversed, and cannot be charged to Universal. The Court concludes that the remaining 14 withdrawals pointed out by the Trustee were not reversed, and so finds Universal liable to the estate in the amount of $36,311.74.

**National Grid Payment**

The second issue before the Court is whether Universal must turnover a check from National Grid to ICS in the amount of $7,246.00. It is undisputed that this check was received by Universal on December 26, 2008, and cashed on December 29, 2008. Although National Grid did not owe an account to ICS or Universal, Universal asserts that this payment was made for the account of TRW Fastening Systems, an account which Universal had acquired under the Factoring Agreements.[3] Universal had advanced ICS funds upon acquisition of the TRW

---

[3] During the pendency of this adversary proceeding, the Court granted the Trustee a default judgment against National Grid in the amount of $28,984.20. This judgment is almost certainly related to the same antecedent debt (the TRW Fastening Systems account) as the payment received by Universal from National Grid. This decision does not determine any party's right to payment based on the default judgment, or whether or not National Grid has satisfied its obligations thereunder.

account, and at the time the payment of $7,246.00 was made, there was an unpaid balance of $7,281.52 on this advance.

The Trustee does not seriously dispute that the payment was made toward the balance on the TRW Fastening Systems account,[4] but instead argues that at the time the payment was made, Universal did not have the authority to negotiate a check made to the order of ICS. *See* Trustee's Proposed Findings and Rulings at 6 [docket # 47]. This argument may be a red herring because Universal, not ICS, was the owner of the TRW account, and even if the check had been received by ICS or the Trustee, Universal would have been entitled to it.

There is nothing in the agreements, motions, and orders constituting the postpetition financing arrangements between ICS and Universal that specifies a date when Universal must cease negotiating checks payable to ICS. The Trustee makes much of the fact that the check was received by Universal "two and a half months after the conversion from Chapter 11 to Chapter 7," but, absent an agreement of the parties or a court order to the contrary, a conversion does not necessarily nullify an agreement made between a Chapter 11 Trustee and a creditor of the estate. *See* 6 *Collier on Bankruptcy* ¶ 721.04 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2009) ("Following the conversion of a chapter 11 case to a chapter 7, a chapter 7 trustee may . . . be bound by the terms of a court approved stipulation entered into by the . . . chapter 11 trustee prior to the conversion of the case to chapter 7."). Universal's right to negotiate the check had not perished, and as the payment was made to an account then owned by ICS, the Court finds no reason why the $7,246.00 should be turned over to the Trustee.

---

[4] In fact, the Complaint itself alleges that National Grid is liable to pay the TRW account. *See* Complaint at para. 39 [docket # 1].

**Conclusion**

The Court finds that Universal must turnover to the Trustee $73,326.18 (constituting the agreed amount of $37,014.44 plus advance fees of $36,311.74), together with interest from the conversion date of October 10, 2008 to the date of this judgment.

A separate order will issue.

Dated: November 24, 2009

_____
U.S. Bankruptcy Judge